## Case No. 1,193.

### BEARSE et al. v. THREE HUNDRED AND FORTY PIGS OF COPPER.

[1 Story, 314.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1840.

SALVAGE—ACTION—GROUNDS OF APPEAL—BURDEN OF PROOF — COMPENSATION — ADOPTING CONTRACT.

1. Courts of admiralty will not encourage appeals in salvage upon slight or frivolous grounds, or, indeed, in any cases, except upon some plain, clear, and determinate mistake of law or fact in the court below, which is manifestly not justified by the circumstances; and the onus probandi of such mistake is upon the appellant.

[Cited in U. S. v. Juniata, 93 U. S. 339. See, also, Cushman v. Ryan, Case No. 3,515; Taylor v. Harwood, Id. 13,794.]

2. In salvage cases, where a contract is made between the parties under circumstances, where there is no such necessity, as to require immediate relief, at any expense or hazard, on the one side, and on the other there is no obligation to lend the required assistance, and no motive to take advantage of the urgency of the peril in driving an unconscionable bargain, the court will adopt and enforce the contract as just and conscientious.

[Cited in The A. D. Patchin, Case No. 87; The H. D. Bacon, Id. 4,232; The Independence, Id. 7,014; Pope v. The Sapphire, Id. 11,276; Harley v. Four Hundred and and Sixty-Seven Bars Railroad Iron, Id. 6,068; The Silver Spray, Id. 12,857; The Williams, Id. 17,710; The Dolphin, Id. 3,973.]

3. The maritime policy is to make a liberal allowance in salvage cases. The highest compensation, which is ordinarily allowed in the most meritorious cases, is one moiety, and that is rarely given. There are some exceptions, as where the property saved is very considerable,

---

[1] [Reported by William W. Story, Esq.]

and the danger and difficulty of the service are so great as to require an extraordinary compensation.

[Cited in the Narrangansett, Cases Nos. 10,-017, 10,020.]

4. Where several contracts for salvage services were made at various successive times, and a subsequent salvage service was performed, under no definite contract, the rule (of salvage) fixed in the prior contracts was held not to be imperative, but only to be an auxiliary circumstance in determining what was a fair allowance for such subsequent salvage service.

[Cited in The A. D. Patchin, Case No. 87.]

[Appeal from the district court of the United States for the district of Massachusetts.]

In admiralty. Libel for salvage [by Joshua L. Bearse and others against 340 pigs of copper, of the cargo of the ship Mercury, (the Washington Insurance Company and others, claimants.) Decree for libellants, (unreported.) Claimants appeal. Modified.] The libel in substance stated as follows: That in February, 1837, the ship Mercury, owned in Boston, struck upon a reef, called Pollock Rip, near Monomoy Point, with a large and valuable cargo of wool and copper, and was totally lost, and abandoned to the underwriters. That the wreck went to pieces, and, among other things, 4600 pigs of copper became imbedded in the sand, and so remained, anu became derelict. That the libellant, by authority given by Thomas Lamb and Caleb Curtis, agents for the owners of the ship and cargo, recovered a large quantity of merchandise before the ship sunk, and received a salvage of 27½ per cent. on the net proceeds of some of the property, and 19 per cent. on the residue. That in August, 1828, the ship having sunk, the libellants and agents entered into a contract, by which 50 per cent. was allowed them, on all the copper they should recover; in pursuance of which, they did recover 108 pigs of copper, and delivered them to Lamb and Curtis, at Boston, and were paid one half the net proceeds. That they were afterwards authorized to watch for a favorable opportunity to recover more, which they did, during the whole of the last winter; and such favorable opportunity having presented itself, the libellants diverted their schooner Pearl from her occupation, as a fishing vessel, hired suitable persons, and procured machinery and apparatus at great expense, and proceeded to fish up pigs of copper from the sand. That through fear of forfeiture of the schooner, they surrendered the former license, and took out a coasting license, and devoted the vessel wholly to the business of getting up this copper. That, between the 1st of May and the 9th of June, they recovered, with great labor, 340 pigs of copper, laboring, on an average, 20 out of the 24 hours; and that the average depth of water was 11 feet, and at high tide, 16 feet. That the libellants could not get their vessel insured, while thus engaged; that the weather was rough, and

Pollock Rip a dangerous place. That the vessel received great damage, and was much exposed, and that the labor was far greater than in recovering the former portion of the cargo. That the libellants supposed, that the former contract, allowing them one moiety of the proceeds, still subsisted, or if it did not, that the agent would carry out the spirit of that contract; without which belief, they would not have undertaken the labor. That these services were worth more than 50 per cent. of the property recovered. That, while thus employed, on or about the 20th of May, 1839, the said Lamb wrote to the libellants, that the owners would allow only one third of the proceeds as salvage, which letter was received while the libellants were employed, and had recovered considerable copper; and that they immediately wrote and refused to agree to take less than one moiety, and continued, by suitable apparatus, to fish up the copper, intending to claim such compensation as the court of admiralty should decree. That on the 9th day of June, the said Lamb ordered them not to recover any more, unless they were willing to accept one third of the net amount, which they refused. That the libellants alone have performed this service; and, in consideration of its danger and risk, that they are entitled to meet and competent salvage. That in consideration of the risk and danger, the respondents entered into a contract with one or more persons, to recover what portion of the copper they were able, for which they were to pay over to the said claimants, 25 per cent., and no more; and the libellants pray, that a true copy of such contract may be annexed to the answer.

The answer in substance stated the circumstances of the wreck and the cargo, and admitted, that on June 3d, the respondents made a contract with the libellants, allowing them 27½ per cent. for the merchandise recovered; and further stated, that in consideration of the greater difficulty of obtaining the copper during the winter season, and upon the representation of one Amariah Harnden, an agent of the respondents, that he had constructed certain machines, peculiarly well adapted for the recovery of the cargo, they entered into another contract on August 4th, 1838, allowing one moiety of the proceeds, for the ensuing three months, as recompense for salvage services, and that it was only for these reasons, and for this limited space of time, that the respondents would make such a contract. That the respondents paid the libellants, on September 1st, 1838, $1656, being the half of the proceeds of 108 pigs of copper, taken up in those three months, and that part of these pigs had been recovered before making this contract, and fraudulently concealed for some unlawful purpose. That 40 pigs only had been recovered during the month of August, and that the court should decree the whole $1656, to be paid to these respondents. That, on

the 10th of November, 1838, the same contract was renewed, to run to March 1st, and that there were no other contracts. That the machinery, or apparatus used, was a pair of tongs, not exceeding six dollars in value, which was devised by A. Harnden, an agent of these respondents, and that the other apparatus consisted of a common coal-hod and a common scoop, of the cost of about two dollars. That the libellants made false and fraudulent representations, to induce these respondents to grant them a higher compensation, which ought not to be decreed. That the injury to the schooner Pearl arose from the eagerness and hurry of competition with other vessels, and not from the hazard and exposure; and that there could have been no difficulty in effecting an insurance; and that there was no exposure of life or property. That the libellants never had cause to believe, that any contract existed after March 1st, 1839. That by a letter of May 25th, 1839, these respondents offered the libellants one third of the proceeds as salvage money, which offer they refused; and that their continuance in their labors was a violation of the rights of these respondents; and they are, therefore, not entitled to compensation; and the respondents pray, that if the court decree any compensation, it shall not exceed one third of the last sum offered. That all the letters, show, that the libellants intended to act under the offer of the letter of May 25th, 1839. That a contract dated April 23d, 1839, and renewed for the term of a year, on March 5th, 1840, has been entered into between these respondents and James Davis, whereby the said Davis is, at his own expense, to recover as much of the cargo as he can; and the proceeds of the property recovered are to be divided in the proportion of one fourth to the respondents and three fourths to Davis. That the copper is less exposed and more embedded in sand; and that the said Davis has been at great expense. The answer prayed, that there should be a restitution of the copper, and that the libellants should be decreed to pay costs.

The case was argued in the district court by William Gray and C. G. Loring, for respondents, and B. R. Curtis and George T. Curtis, for libellants.

The district judge at the hearing, decreed to the libellants the sum of one moiety of the net proceeds of the copper.[2]

The points made and argued by the counsel for the respondents, and decided by the learned district judge, were, in substance as follows:

(1.) It was denied, that the property was derelict. The judge, declining to settle the question for any of the other cases, held it not to be a derelict as to these libellants, on account of the numerous acts of ownership exercised by the claimants, and known to the libellants.

(2.) It was denied, that the services had been of any great benefit to the claimants, but on the contrary, that the libellants were intruders, who had no right to intermeddle with the property. The judge cited the discussion by Domat of the general principle, that no person can intermeddle with the affairs of another, without some request; but said, that salvage services were an exception to this rule, and that our own law had its rules for governing cases of such service. He also held, that the evidence clearly showed, that when the libellants first began their enterprise, it was approved by the owners, and that this approbation was afterwards repeated, until the agent of the owners forbade them to proceed farther, unless they would agree to work for one third of the proceeds.

(3.) It was denied, that the libel could be maintained at all in rem, admitting that it might be in personam, because, as the respondents contended, where a service, which would otherwise be a salvage service, is performed by contract, the salvor has no right to retain the property, and so cannot proceed against it. But the judge held, that as the respondents had denied in their answer, that any contract subsisted between them and the libellants, at the time the property was recovered, which also appeared upon the evidence, the libel was rightly brought against the property, whether the principle contended for by the respondents was correct or not.

(4.) Certain charges of fraud were made by the respondents against some of the libellants, the principal one, noticed by the court, being, that Bearse and his brothers (the four principal libellants), who, with one Amariah Harnden, had, in 1838, made a contract with the owners, by which they were to have fifty per cent. of all that should be recovered of the Mercury's cargo, had, before the making of the contract, recovered a lot of copper, which they fraudulently brought into the settlement, and upon which they claimed and received fifty per cent. under said contract. But the judge refused to deduct any thing from the salvage compensation on account of this alleged fraud, being of opinion, that the evidence did not sustain it.

(5.) The case, then, not being one of derelict, the learned judge said, that the amount rested wholly in the discretion of the court. Although not derelict, yet the property was lost, in the sense of the distinction taken by some writers. It was in a hopeless condition, as appeared from the amount, which the owners had repeatedly been willing to give, and had once actually given. The court must have some guide to its judgment; and, upon the whole, no better rule could be assumed, than that proportion, which the owners by their own estimate had fixed and formerly paid; and he, therefore, decreed one moiety of the net proceeds of the property.

From that decree the claimants appealed to the circuit court, and filed the following causes of appeal.

---

[2] [Decree of district court unreported.]

(1.) Because the court erred in ruling, that the services of the libellants, alleged and attempted to be proved, were of the nature of a salvage service, entitling them to relief as salvors.

(2d.) Because the court erred in referring to the former contract, between the owners and some of the libellants, made in August and November, 1838, and the owners and certain other persons made in April, 1839, and renewed in March, 1840; and in assuming them to be a proper standard and criterion, by which to award compensation to the libellants; the court having stated, in the announcement of the decree, that these contracts were considered by the court, as a standard, furnished by the parties; and without which, the court would have been inclined to award a much lower compensation.

(3d.) Because, if the libellants were entitled to any thing, the court erred in decreeing, that they were entitled to more than one third part of the net proceeds of the copper recovered, because it was proved, that prior to the recovery of any, excepting one pig, the owners offered to them such one third, as a full compensation, and that the libellants proceeded to obtain all, which is libelled in this suit, after such offer, and without any refusal to accept the same.

(4th.) Because the court erred in allowing to the libellants any compensation, inasmuch as by the allowance of one half part of the net proceeds, the court must have found, that the libellants refused to proceed under the said offer of 27th of May; and if such refusal took place, the libellants, in proceeding thereafter to meddle with the copper, were unlawful intruders, or at most rendered a voluntary and gratuitous service, for which they have no legal claim for pecuniary reward.

(5th.) Because the amount decreed to be allowed to the libellants is disproportionate to the services actually rendered, and manifestly excessive.

(6th.) Because the decree of the court is otherwise erroneous, as appears by the pleadings and proofs.

The first, fourth, and sixth reasons of appeal were waived by the appellants.

George T. Curtis and B. R. Curtis, for libellants.

William Gray and Charles G. Loring, for appellants.

STORY, Circuit Justice. This is the case of a libel in rem for salvage of a part of the cargo of the ship Mercury of Boston, which was sunk on a reef called Pollock Rip, near Monomoy Point, at the extreme of Cape Cod, in February, 1837. The libel asserts the salvage service to have been performed by the libellants, in recovering the copper now in controversy, under the express or implied sanction of the claimants, between the 24th of May, 1840, and the 9th of June following. The general outline of the leading facts is accurately stated by the learned district judge in his opinion in the case; and to that I gladly refer. The cause has been very ably and elaborately argued in this court, both upon the general topics of law and fact, and the more exact and minute details of fact belonging to the salvage service. In the view, which I take of the matter, it becomes unnecessary for me to advert to many, and indeed to most of these topics and details, because it seems to me, that the merits of the case, so far as the same are now proper for the consideration of this court, lie in a narrow compass, and, although very properly examined and considered by the learned district judge, are not necessary to be here reviewed.

It is well known, that in salvage cases the appellate courts of the United States, sitting in admiralty, are not disposed to encourage appeals upon light or frivolous grounds, nor, indeed, in any case, except where there has been some plain, clear, and determinate mistake of law or fact, which has led to an erroneous and extravagant diminution or increase of salvage, beyond what the circumstances manifestly justify. The allowance of salvage rests in the exercise of the sound discretion of the court; and it would be most mischievous to the interests of all concerned, and would encourage protracted litigation, and in some cases ruinous expenses to the parties, if, where that discretion is fairly and reasonably exercised, the appellate court should entertain jurisdiction; and because it might not originally have arrived at exactly the same conclusion, as to the rate of salvage, in the exercise of its own discretion, therefore it should reverse the decree of the inferior court. If there ever can be any class of cases, to which the doctrine most emphatically applies, interest reipublicae, ut finis sit litium, that of salvage constitutes the class. The merits of such services rarely admit of any definite and exact computation; and it would be delivering over the whole subject to interminable doubts, to encourage the efforts of the parties to gauge the discretion of different courts, and to run a race for victory upon the chances of the possible differences of judicial opinion, necessarily connected with the accidental views, or the complexional habits of thought of different minds. In matters of mere discretion, the mind of man must ever be varium et mutabile. It is on this account, that it has become a general rule, I had almost said a fixed law, of our appellate courts, sitting in admiralty, not to change the decree of the court below, unless there is an exceedingly strong case made out of an abuse or palpable mistake in the exercise of its discretion in the decree of salvage.

Having made these preliminary remarks,

my duty then is to ascertain, whether there has been, in the salvage awarded by the present decree, any such palpable mistake; for there is no pretence to suggest, that there has been any abuse in the exercise of the discretion of the court. And here the case, in the aspect, which it has assumed at the argument in this court, is reduced to the narrower consideration; whether the salvage ought to be one moiety, or one third of the net proceeds. The learned counsel for the appellants have not contended against the allowance of one third, but have candidly admitted, that they shall make no struggle in opposition to it. In looking at the facts of the present case, we at once see, that it is one of the few and excepted cases, in which there may be a private contract, fixing the rate of salvage, which will be, and ought to be, obligatory between the parties. The situation of the parties, the nature of the service, and the absence of all controlling necessities, requiring immediate relief, on one side, at any expense and hazard, in order to escape from impending perils and calamities; and on the other side, the absence of any duty to lend the required assistance, or any motive to take advantage of the necessities and urgencies of those perils and calamities, to drive a hard and unconscionable bargain; these circumstances make it a case, where the court not only looks with indulgence upon such a contract, but endeavours to fortify itself against the exercise of mere discretion, by adopting and enforcing such a contract, as equally just, moral, and conscientious.

Now, in respect to the salvage service, here in controversy, there is not, in my judgment, any ground to assert, that any fixed or definite contract for the service existed between the parties, as did exist in relation to other similar salvage services about the same property at prior periods between these salvors and other independent salvors. These latter contracts cannot, then, furnish a positive rule for the exercise of the discretion of the court upon the present occasion. They may furnish auxiliary grounds to assist the judgment of the court, as to what the parties thought, at different periods, was a fair allowance for services of the like sort; but they cannot properly control or direct its judgment, since the circumstances might not, in all respects, be the same; or the parties may, upon a more exact review, have changed their opinion as to the relative value and difficulty of the service.

The present salvage was begun about the 24th of May, 1840, (the particular day is not very material,) under the sanction of the claimants. As soon as it was made known to the latter, they at once promptly replied, and informed the salvors, that they should be willing to give one third of the value of all the property saved. This offer was not (as I think the fair result of the evidence shows) accepted; but it was deemed by the salvors too low. Still the salvors went on with their service, with the acquiescence of the agent of the claimants, expecting, without doubt, that subsequent negotiations would lead to an ultimate increase of the salvage. On the 7th of June following, the salvors were definitely informed, that no more than one third would be allowed, and that if they did not accede to the proposal, they might quit the service, and the enterprise would be carried on by others. The salvors refused to accept the proposal, and left the employment, and never afterwards resumed it. Their present claim is, therefore, limited to the mere question of a quantum meruit; there being no specific contract to regulate it. They certainly had a right to decline the offer of one third; and, on the other hand, the claimants had an equal right to refuse any increase thereof. The court is driven to the necessity of deciding, what is the proper allowance; not, indeed, upon the footing of a mere quantum meruit for labor and services, upon the dry principles of the common law, but upon the footing of a quantum meruit, upon the enlarged principles and policy of maritime jurisprudence in salvage causes, where many other ingredients enter into the question. Many of these ingredients were adverted to by this court, in the case of The Emulous, [Case No. 4,480.] To which ought to be added, the maritime policy of making the allowance liberal, in order to secure fidelity, honesty, and activity in the service, and to cut off the strong temptations to private plunder and embezzlement, in order to make up any supposed deficiency of compensation under the ordinary principles of the common law.

In a general sense, the highest compensation, which courts of admiralty are in the habit of awarding, in the most meritorious cases, is one moiety. There are exceptions, indeed; but they are, where the property saved is very inconsiderable, and the gallantry, and danger, and difficulty of the service have been so great, as seemed to require an extraordinary compensation, hardly to be measured in value. But except in such peculiar cases, a moiety has rarely been exceeded. See The Jonge Bastiaan, 5 C. Rob. Adm. 322, where two thirds of the value was given. But there it was a case of derelict, and of great peril and extraordinary merit in performing the service, and the property saved was not large. And, indeed, even a moiety has rarely been given, except in cases of derelict. See The Aquila, 1 C. Rob. Adm. 37, 43–46. The present case, certainly, does not fall within that predicament. The property has never been treated either by the owners or by the salvors as derelict; but all operations respecting it have been constantly under the advice, sanction, and superintendence of the owners, who have in the strictest sense asserted, as they had a right to assert, a continual claim over it. We may, therefore, at once dismiss all considera-

tion of it either as a case of derelict or of quasi derelict.

I agree, that in the present case, the onus probandi is on the appellants to displace the allowance of the moiety by the district court, by some clear and important grounds of mistake in the application of the facts or principles of law. But when the allowance is the highest rate, which is usually allowed in the most favored cases, it seems to me, that the facts ought to show, that the case in judgment belongs to that category. If the case were one standing upon a fixed private contract, it would be wholly unnecessary to look to such considerations. But if the highest reward in ordinary cases is given, the court ought to see, that that reward was fairly earned by services, to which it is properly and usually applied; that is, to cases of extraordinary peril, or suffering, or gallantry, or long and continued services of an excessively exhausting and pressing nature. It is not enough to say, that the parties contracted at another period, and then estimated the value of the like services at the same high rate. If it were admitted, (and it has been denied at the argument,) that the circumstances were essentially the same, that fact would not govern the present case; because, the parties in matters of contract may agree according to their pleasure, and afterwards vary the same at their pleasure. If, in dealing with the same or with different salvors at one time, they estimate the value of the salvage services to be rendered at 27½ per cent. of the value of the property, at another time at 50 per cent., and at another time at 75 per cent.; and at the time, when other and new salvage services are required, at 33 per cent., it is not necessary or a natural inference, that the higher sums approach more nearly to a just equivalent for them, than the intermediate sums. And, if the local position of the property is such, that it is liable to be buried up in the shifting sands of a reef, exposed to the whole storms of the ocean, which sands are several feet deeper at some times than at others, it is very obvious, that a sensible change of circumstances, as to the depth of the sands, might induce the belief, that the enterprise of rescuing the property would be far more laborious and uncertain, and worth far more at the unfavorable, than at the favorable periods. There is, also, great difficulty in affirming in cases of this sort, that, at distant intervals of time, all the circumstances are treated by both parties, as precisely in their substance similar, throughout. Many ingredients of despondency or hope, of active preparation, or languid effort, may vary the judgment of the owners at different times, even if there be no essential change in the local state of the property. There was much ground for fluctuation of opinion on this point, on the part of the owners, since the property was, as has been forcibly stated by the district judge, adopting the language of

Loccenius, always treated by them, not as derelict, but as submerged, non in derelicto, sed in deperdito.

It appears to me, then, that the court is not at liberty to adopt the rate of salvage, fixed in the prior contracts, as a positive or controlling rule, but merely to examine them as adminicular circumstances, to assist its own judgment. With the greatest deference for the learning and ability of the district judge, I cannot but think, that these prior contracts had too controlling an influence over his judgment. As I understand his opinion, but for these prior contracts, he would have been satisfied with awarding the sum of two fifths of the value of the copper to the salvors, not, indeed, as an exercise of what Cleirac denominates judicium rusticum (although I am far from thinking that such a rule may not in some cases be properly resorted to); but as an apportionment, just and equitable, under the circumstances of the present case, and not unfrequently awarded in admiralty suits for salvage. If he had done so, I confess, that I should have seen no reason to complain of his decree, and should have declined to interfere with it.

But the allowance of a moiety certainly stands upon a different footing; and, as has been already stated, is rarely awarded, except in cases of extraordinary peril, difficulty, and distress. Do any circumstances of that sort constitute ingredients in the present cause? It appears to me, that they do not. There was, in fact, no uncommon peril, or exposure, or difficulty in this salvage service. There was no hazard of life; no storms were encountered; and no excessive and exhausting labors, which either endangered health, or required unceasing nocturnal vigilance, and abstinence from rest. The season was mild; and if the weather became boisterous, there was a safe and easy retreat to the main shore, within three or four miles. I do not mean to say, that the labor and services bestowed were of an ordinary sort, and merely such as might be commanded by the common daily pay in nautical business. Far from it. They were of a much higher character, and are entitled to a more ample reward. The owners offered one third; the salvors demanded at least a moiety. It was clearly not a very tempting employment; for the salvors rejected the one third, and quitted it. The salvors, who succeeded them in the enterprise, under the auspices of the owners, were in effect paid one third; the crew of one of the salvor's vessels receiving that rate from the beginning, by contract; and the crew of the other salvor's vessel being at first hired upon daily wages, but, becoming dissatisfied with that compensation, they were afterwards allowed at the same rate. So, that I think, that I am at liberty to presume, that this was the lowest rate, at which any suitable persons could be hired to perform the like service. Indeed, I understand, from the argument, that under the contract of Davis

and others with the owners, for which they were to receive 75 per cent., in consequence of the greater depth, at which the other copper lay in and about the bottom of the vessel, these latter salvors did not, in fact, taking into consideration the length of time, which they were employed, and the quantity of copper, which they saved, receive a proportionate compensation approaching to that, which the libellants would receive, by a salvage of one third. I do not, however, dwell on this; because, being performed under a special contract for a more protracted service, Davis and others must take it for better or for worse. The events might have turned up in their favor; and then they would have received a much larger compensation. It is said, that, when the owners offered the one third, they did so, because they expected, that the libellants, if they accepted it, would continue in the service, as long as it could be useful, or should be required. But no such terms were contained in the stipulation; and, indeed, the offer was manifestly of one third, so long as they should choose to remain in the employment. It was one third of what they should save, without any condition as to the length of time, or the extent of labor, or the amount of the property saved. In this respect all the other contracts with the libellants, (as well as this offer,) may perhaps be properly distinguishable from the contract with Davis and others, who certainly engaged for some positive efforts, and incurred some expenses, to accomplish the object, although they were not bound to continue those efforts for any certain length of time. But the contract of Davis and others cannot, as has been already suggested, govern the present claim, even though it may have turned out to be a losing or inadequate bargain; since we are not to judge of this salvage service by after events, in which other salvors were concerned.

The view, then, that I take of the case is this, that the former contracts may, in a great measure, be laid out of the case, at least, so far as they are supposed to furnish any positive rule for decision. In this respect I am compelled to come to a different conclusion from the district judge; and, as this seems to have formed the very foundation of his decree, I feel myself, with whatever reluctance, bound to state, that it is not maintainable. I cannot think, that the facts of the present case, calling for the exercise of the sound discretion of the court, would justify me in the allowance of one moiety; since that would be to award the highest compensation, given only under extraordinary circumstances, to a case, where no such circumstances are presented. On the other hand the proffered allowance of one third was in the present case treated as a suitable, but at the same time, as a strict measure of compensation by the owners, and does not exceed, what they gave to others, and, indeed, to strangers. Now, it seems to me, that the

libellants are entitled to a more favorable consideration, because they were employed, from time to time, during a considerable portion of two years, to watch the shifting state of the property, and to communicate to the owners whatever favorable changes might take place. They undertook, and they performed this duty; and, in my judgment, with entire fidelity to the interests of the owners; and they have received no distinct compensation therefor. They were the first to ascertain, and to communicate to the owners, the favorable change of the state of the property in May, 1840; and they promptly availed themselves of the opportunity of engaging in the service, without waiting for the results of a tardy negotiation for compensation. Under such circumstances, it appears to me, that they are fairly entitled to a more favorable consideration from the owners than others, who came in at a later hour, and had bestowed no like watchfulness and effort. It is somewhat of a stern and harsh exercise of right by the owners, to put aside the claims of persons, who have been prompt to communicate intelligence, and to act with spirit for their interests, and to deal with them with the cold and reluctant caution of a bargain with mere strangers. I think, that the owners were bound to make a more liberal allowance, than one third, on account of these peculiar merits of the libellants. The sum of two fifths, which the district judge thought reasonable, independent of any contract, appears to me to reach the true equities of the case, not as a judicium rusticum, but as a just estimate of the aggregate merits of the libellants in the present case, under all the circumstances. I shall, therefore, reverse the decree of the district court, as to the allowance of a moiety, and shall allow two fifths of the net proceeds, as salvage to the libellants. The costs of the appeal ought, in my judgment, to be borne as a common charge on the whole property saved.