Judgment reversed; new trial ordered.

## THE NEW MOON.

### THE URANIA.
#### Nos. 13131, 13133.

District Court, W. D. Washington, N. D.
Feb. 3, 1932.

Harroun, Robinson, Maloy & Shidler, and C. E. H. Maloy, all of Seattle, Wash., for libelants Legaz and others.

Bogle, Bogle & Gates, and Edward G. Dobrin, all of Seattle, Wash., for libelant Vojkovich.

NETERER, District Judge.

These libels were consolidated and tried together.

Each fishing craft, the New Moon and Urania, seeks damages from the other for injuries sustained by collision while fishing on the fishing grounds off Cape Flattery. The fishing grounds lie at the entrance to Puget Sound, and comprise a zone of about ten miles square. Through these waters the salmon return into Puget Sound on the way to their spawning grounds on the Fraser river. The fairway for all commercial or seagoing vessels from ports on Puget Sound and Vancouver and Victoria, B. C., for all parts of the world, is over this zone. More than 150 fishing boats are operating on these waters at the same time. The salmon run in schools, and can readily be seen by salmon "jumping" out of the water.

The Urania is 76.3 feet long, 16.5 feet beam, 8.1 feet depth, and had a crew of 16 fishermen. The New Moon is 55 feet long, 14 feet beam, and had a crew of 9 fishermen. The purse seines carried are sixteen to twenty fathoms deep and 280 fathoms long. The seine on the New Moon had 1,400 pounds of lead in small size sinkers fastened at uniform spaces on the lower lead to sink the seine, and had corks similarly spaced, fastened to the top lead to hold the seine upright. The seine is placed in the stern of the fishing boat, one end of which is tied to the bead of the boat by a rope, and the net is set by fastening one end and purse line to a skiff placed for the purpose near to the school of

fish. The fishing boat then is moved and the seine on the stern unfolded, and is by the movement of the fishing boat cast into the water.

The course of the fishing boat is circular, to port or starboard (governed by the relation of the fish to the boat), around the school of fish to the place of the "set net," and the purse line is then thrown from the skiff to the fishing boat, and the seine pursed by the winches, and "haul made."

The testimony is practically in agreement as to the location, in legal effect, of the New Moon and the Urania with relation to the school of fish and to each other. The proofs in the case establish without doubt that the New Moon set its net, and after casting 30 or 40 fathoms of seine by forward movement of the fish boat blew three or four blasts of the whistle, signifying that it had set its net and was proceeding to port to circle the fish, and proceeded to port on its course at the usual speed. After it had cast about 100 fathoms of seine, the Urania, lying to the starboard and seeing the New Moon, set its seine and proceeded, without blasts of whistle, on a course starboard quarter at 40 to 90 degrees across the course of the New Moon, casting its net on its course at more than usual speed. The New Moon kept its circular course and speed and the Urania, approaching on a course starboard quarter, as stated by witnesses, 40 to 90 degrees, across the bow of the New Moon, two blasts were given by the New Moon, to which the Urania gave no response. Both boats continued on their courses, and a collision being obvious, the New Moon blew a danger blast, put its wheel hard-a-port, turning the New Moon to port. The Urania, just before the collision, reversed its engine, and the Urania, by forward port momentum, struck the New Moon, injuring the stem of the Urania and the starboard side of the New Moon, causing it to take water, and likewise injured its engine and seine, all to its damage, as hereinafter stated.

Each vessel claims it was the privileged vessel.

It is established that there is common rule of principles and usages which grew out of the conduct and habits of the fishermen in this fishing zone for a long period of years applying to the conduct and operation of fishing boats in security and mutual protection and regularity of conduct, to promote peace and harmony in fishing and to protect life and property. The rule makes the vessel first setting its net and proceeding on its course to circle the school of fish the privileged vessel, and after three or four blasts of the whistle, indicating such act, all vessels must keep out of the way. Both vessels and masters have been fishing in these waters many years.

The origin of admiralty regulation of navigation and commerce was the power of the admiral. Anciently, he was a great officer, governed the Navy and adjudicated all maritime matters, and his power in navigation and commerce extended over the navigable waters to all parts of the world. The origin is in doubt, probably Asiatic, unknown in Europe before the time of the Holy Wars. The admiral judged all matters relative to merchants and mariners pursuant to law of Oleron, which was taken, so far as it was available, from the Rhodian law, which was promulgated about 70 years after the reign of Solomon, King of the Jews. The autocratic power of the admiral by long period of melioration and unfolding through development of common rules of principles and usage which grew out of conduct and habits of those engaged in maritime commerce, found expression in the equitable system of admiralty law now in force among the nations. Each nation has its admiralty rules and law. The Supreme Court, in The Lottawanna, 88 U. S. (21 Wall.) 558, at 572, 22 L. Ed. 654, said: "Maritime law can hardly be said to have a fixed and definite form as to all the subjects which may be embraced within its scope. * * * No nation regards itself as precluded from making occasional modification suited to its locality and the genius of its own people and institutions."

The written rule, no doubt, first found expression after the need was established by rules and principles, usages, developed by the conduct and habits of those engaged in traffic on the sea, suited to people in definite localities and special institutions. Our admiralty rules and law are dependent on laws of the United States. The Lottawanna, supra; The Elfrida, 172 U. S. 186, 19 S. Ct. 146, 43 L. Ed. 413.

The admiralty extends to the high seas, and also to navigable rivers, whether tidal or not (The Moses Taylor, 71 U. S. [4 Wall.] 411, 18 L. Ed. 397), and to rivers and lakes which are highways of commerce (The Daniel Ball, 77 U. S. [10 Wall.] 557, 19 L. Ed. 999), not to a river not of itself a highway for interstate or foreign commerce (U. S. v. The Montello, 78 U. S. [11 Wall.] 411, 20 L. Ed. 191). The waters in this zone were not used

by the fishermen for interstate or foreign commerce. Navigation or commerce, or acts having relation thereto, are essential ingredients of application of navigation rules. While the waters within the fishing zone of Cape Flattery are tidal and navigable, the fishing boats and fishermen are not engaged in commercial navigation, as such, or commerce. "Commerce," as used in the Federal Constitution (Const. U. S. art. 1, § 8, cl. 3) and laws, means trade in articles of property. Western Union Tel. Co. v. Mayer, 28 Ohio St. 521; Western Union Tel. Co. v. Texas, 105 U. S. 460, 26 L. Ed. 1067.

The fishermen, being engaged on the high sea in an occupation or employment, may have a code of rules among themselves regulating their conduct in operation of fishing boats within the industrial fishing zone not in conflict with the rules of navigation.

■ It must be manifest that unless some rule of conduct obtains to govern and control the fishing boats engaged in a unit independently operated in private and personal employment in the industrial utility zone, a condition of anarchy in this zone would be but a short step. It is obvious that the Cape Flattery fishing zone, ten miles square, has, with relation to the industry and navigation and commerce, a distinct personality, and composes an industrial utility operated by thousands of fishermen in a community service, each crew and boat in private personal employment receiving the benefit of their labor and governed by a recognized code of rules of conduct applying to all fishing boats and appliances in these waters. It is likewise obvious that this custom is not out of harmony with the International Rules of the Road at Sea, and that the custom which has grown up and been developed, recognized, and utilized by all fishermen in this zone is the construction placed by all the fishermen in this fishing zone, upon article 26, International Rules (33 USCA § 111): "Sailing vessels under way shall keep out of the way of * * * boats fishing with nets. * * * This rule shall not give to any vessel or boat engaged in fishing the right of obstructing a fairway used by vessels other than fishing vessels or boats."

Boats with "net set," by the same token, are privileged by this rule, and was so considered by usage and custom of the fishing zone. If not so considered, "the subject embraced" is not within the scope of maritime rule, and the court would be warranted in saying that this custom constitutes unwritten law in this zone in relation to fishing.

LaBoyteaux, in rules of the Road at Sea, at page 167, says: "This article is but a codification of the unwritten law of the sea prevailing before the present rules were formulated, that free vessels must keep out of the way of fishing vessels or boats encumbered by having nets, trawls or lines."

The Urania knew the New Moon's net was set and that she had proceeded on her course before she set her net and moved forward, and under this article, as well as the custom, it was her duty to keep out of the way.

■ A course need not be straight. In legal contemplation, a course may follow the winding of a stream. Wharton v. Brick, 49 N. J. Law (20 Vroom) 289, 8 A. 529. The course of a vessel is her apparent course. The Hallgrim (The Havre Maru) 20 F.(2d) 720 (C. C. A.). The apparent course of the New Moon and the course known to the Urania was to port to circle the fish school. "Course" is said by the Supreme Court in The Brittania, 153 U. S. 130, at 142, 14 S. Ct. 795, 38 L. Ed. 660, to be a continuous progression. "Progression" means proceeding in a course. The New Moon was in continuous progression at its usual speed, proceeding on an apparent, recognized and known course.

Judge Learned Hand, for the Court of Appeals, in Commonwealth & Dominion Line v. United States, 20 F.(2d) 729, at 731, says a ship is on a steady course not only when her heading does not change, but whenever her future position is certainly ascertainable from her present position and movement.

■ Assuming neither article 26 nor custom have application, the Urania knew the New Moon had set its net and had proceeded in the only course open to accomplish the object in safety, for the seine could not change. When the Urania was observed to continue in a course which would result in collision, the New Moon gave two blasts of her whistle, indicating that she was completing her circle to the set net, and which course the Urania knew must be maintained to accomplish the object sought, and safety to the fishing appliances, and created special circumstances which prevented departure from the course. The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126. Under the most liberal construction of the contention of the Urania, under any theory, she was at fault. As said by the Supreme Court in The New York, 175 U. S. at page 205, 20 S. Ct. 67, 74, 44 L. Ed. 126: "But the fact that a steamer is entitled to hold her course does not excuse her from

inattention to signals, from answering where an answer is required, or from adopting such precautions as may be necessary to prevent a collision, in case there be a distinct indication that the obligated steamer is about to fail in her duty. * * * " See, also, article 27, International Rules (33 USCA § 112).

Wilson v. Pacific S. S. Co., 276 U. S. 454, 48 S. Ct. 369, 72 L. Ed. 651, is not in point. These rules must be considered in connection with rule 26, which places fishing boats in a distinct class, and the failure of the Urania to pay attention to the signals, the course and the special circumstances of the New Moon, all of which, known to the Urania, makes her liable.

There are many indefinable impressions from the appearance of the witnesses, the manner and interest, or lack thereof, which add weight to the wholly disinterested testimony. It should also be said that, from all of the disclosures, the conduct of the Urania was not commendable, especially after the collision, with relation to standing by. See 33 USCA §§ 367, 368.

The libel of Antonio Legaz et al., against the New Moon, etc., will be dismissed; and a decree entered in favor of George Vojkovich, for himself and crew, as prayed in his libel. To the owner of the New Moon for $1,702.15 (damages to the boat, $1,383.57; survey $85; repair to engine shaft, $188.58; and repair of seine, $45); and for $1,534.70 for loss of earnings of the New Moon and crew, August 1 to 8, inclusive, to be divided in thirteen shares, as follows: Two shares to the boat; two to the seine; and one share each to the nine members of the crew, together with costs.

This memo is the court's finding. Decree to be presented on notice.