## THE PELICAN.

(District Court, E. D. Michigan, S. D. November 7, 1893.)

### No. 4,024.

SALVAGE—AMOUNT OF COMPENSATION—RESCUE OF DISABLED SCHOONER IN LAKE SUPERIOR.

The schooner Pelican bound down Lake Superior in tow with a cargo of ore on the night of November 18th, broke her tow line in a gale, and, the towing steamer being unable to find her because of the darkness, she continued on under sail until the 21st, when, owing to the continued bad weather, she anchored to the north of Cariboo Island, 20 miles to the north of the usual course of vessels at that season. Late on the afternoon of the 24th her signal of distress was seen by the steamship Pope, also to the northward of her course, and the Pope started to her assistance, but, owing to a snowstorm, was compelled to lie by until the next day, when at the request of the master of the Pelican she was taken in tow and safely delivered that night at Sault Ste. Marie. The Pelican was partially disabled, and partly covered with ice, and, owing to her position and the lateness of the season, was in considerable peril. Her crew were also practically out of provisions. She was worth with her cargo and freight about $16,000. The Pope with her cargo was worth about $325,000. Her earnings were about $700 per day gross, and her expenses about $180 per day. She was subjected to no great danger, but, by reason of the service, was subjected to an additional delay of half a day in waiting her turn to pass through the lock, and also to an extra expense on account of insurance which expired on the 30th. Held that, in determining the amount of

salvage to which she was entitled, her time should be taken into account from the time she started to the assistance of the Pelican, and also the time lost in waiting to pass through the locks which might properly be considered as a proximate result of the service, and that under all the facts she was entitled to an award of $1,300.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, §§ 57-66. Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

In Admiralty. Suit for salvage.

Shaw & Wright, for libelants.
Harvey D. Goulder, for claimant.

SWAN, District Judge. The libel in this cause was filed by the owners of the steamship E. C. Pope to recover salvage compensation for the rescue and bringing into port of the schooner Pelican, which was found lying at anchor about a quarter of a mile to the northward and eastward of the northerly point of Cariboo Island, Lake Superior. The essential facts upon which the claim for salvage was based are succinctly as follows:

The schooner was in tow of the steamer Wocokoken, and was on a voyage from Two Harbors to Cleveland, laden with a cargo of 953 tons of iron ore, something over half her usual load. When off the Apostle Islands, near the west end of Lake Superior, when about abreast of Outer Island of that group, the wind, which up to that time had been very strong, increased to such a violent gale from the S. W. that the master of the steamer found it expedient to look for shelter. He accordingly sought to bring the tow into the wind and make a safe lee; and, while endeavoring to do this, the tow line parted. In the darkness and storm the steamer was unable to descry or pick up her consort, and was obliged to return without her. The accident occurred about 9:30 p. m. of November 18, 1891. After the parting of the line, the schooner went down the lake, but within a few minutes her foresail was blown from the bolt ropes, and, finding it impossible for the steamer to render her any assistance, the schooner kept on down the lake, and, for safe navigation, cut off the end of the tow line which was dragging in the water. The wind and sea continued heavy during the night and for two or three days following, shifting from S. W. to S. E., and around as far as N. W. by W. during that time. The course held by the schooner carried her within about 10 miles of Cariboo Island. On Saturday morning, November 21st, about daylight, the wind being then about S. E., the master of the schooner determined to make a lee under Cariboo Island, as the wind was not favorable, in her disabled condition, to make any attempt to make Sault Ste. Marie. About 10 o'clock a. m. of Saturday the Pelican came to an anchor to the northward and eastward of the Island, and about a quarter of a mile from the reef on its northerly end, where she was found by the E. C. Pope, and was thence taken to Sault Ste. Marie. The value of the Pelican was $12,000, that of her cargo something over $3,000, and half the freight $471, making the total value of the property rescued a trifle less than $16,000. When the Pelican left Two Harbors, she was provisioned

for four days. Her crew consisted of a master, mate, five seamen, and the cook. When she was taken in tow by the Pope, there remained of the provisions two loaves of bread, four or five pounds of corned beef, and perhaps two pounds of dried apples. The rescuing vessel, the E. C. Pope, is a steel steamer with a carrying capacity of about 4,000 tons and is valued at $225,000. She was laden with a cargo of 96,000 bushels of wheat, worth at the time about $99,000. The freight payable on this cargo was 7½ cents per bushel from Duluth to Buffalo. While on her voyage to Buffalo, her destination, and on the 24th day of November, about 4 o'clock in the afternoon, the wind being then W. N. W. and strong, with considerable sea running and the weather being cold with frequent and heavy snowstorms, the Pope then being to the northerly of her usual course, because of the direction of the wind and the character of the weather, her master discovered the Pelican, whose identity was not then known, lying at her anchorage north of Cariboo and flying a signal of distress. Before the Pope could make any material progress toward the Pelican, a heavy snowstorm set in, which shut her out of view. The locality in which the schooner lay is 20 miles out of the usual track of vessels at that season of the year, and is comparatively unfamiliar to navigators. Because of these conditions, the master of the boat considered it imprudent to make any attempt to approach the Pelican that night, and accordingly rounded to, headed his steamer into the wind, and held her in that position during the night, working as slowly as possible consistently with safety, and exhibiting her electric light during the night to make her position and purpose known to those on the schooner. The following morning, the wind and sea having moderated somewhat and the indications being more favorable for fair weather, the steamer came about, and went to the Pelican, which she reached about half past 1 p. m. of November 25th. The master of the Pelican desired to be taken in tow and brought to Sault Ste. Marie, stating that he would not delay the steamer to take up his anchor, but to slip his cable. This he did without buoying it, and within half an hour the Pelican was on her way in tow of the steamer, and delivered her in the canal about 10 o'clock the same night. The weather during all this time was very cold, although the temperature had moderated on the 25th. The Pelican was considerably iced up forward; her bows and forecastle deck being covered, as well as her windlass. Her jibs had been rolled up with salt to prevent their freezing. Her mainsail, while serviceable, was patched, and not in the best condition. The place at which she lay when found was exposed to winds from all quarters, except the south. While the wind on November 25th was favorable to a vessel bound to Sault Ste. Marie, no attempt had been made by the Pelican to leave her anchorage and proceed to that port, because the weather was not yet settled, and some hazard would attend her effort to get away unaided because of her proximity to the Island. The fact, also, that she lay there from Saturday morning until taken in tow by the Pope on Wednesday noon is persuasive that her condition as to navigation was not such, in the judgment of her master, as to warrant an attempt to proceed to Sault Ste. Marie with-

out aid. Having in mind the lateness of the season, the character of the weather, disabled condition of the vessel, and the danger of navigation in her crippled condition, especially in that part of Lake Superior, the probability that the ice might form and imprison the vessel, and the remoteness of her anchorage from the usual path of vessels then navigating the lake, she being so far to the northward of that course as to be invisible to passing vessels on the usual course, and because, also, of the danger of her going ashore if in her attempt to get away she would pay off in the wrong direction, it would seem that the master acted with good judgment in holding on to his anchorage, and that he recognized the dangers and needs of the situation. The evidence satisfies me that, although the Pelican had lain there in safety for four days, the character of the locality was such as to make her continued stay a source of great peril, and would prompt a master of a vessel thus situated to take the first assistance available to enable him to get away, and the proofs are also satisfactory that, if the schooner had been in good navigable condition, she would not have remained at so exposed an anchorage for so long a time. It must also be remembered that the season of navigation was rapidly drawing to a close. Most of the vessels, steam and sail, navigating that lake had made their last voyage for the season, which is generally understood to close on all the lakes, and especially on Lake Superior, November 30th, on which day marine insurance risks terminate, unless extended by special contract. It is true that the steamer performed the services for which compensation is asked in something less than half a day from the time she put out her tow line and took the Pelican in tow until she delivered her in the canal at the Sault; yet, as a matter of fact, she must be fairly regarded as having entered upon the work of rescue from the time she sighted the Pelican, about 4 p. m. of November 24th, when she turned about and lay to, for the purpose of going to her aid, as soon as the weather would permit. This would make the time of her actual services some 30 hours. In measuring the compensation to be awarded, the case has this unique feature, and the reward ought to be at least a fair compensation for the value of the rescuing steamer's time, even though the merit of the services was not of the highest order. It is a legal truism that salvage is not a compensation simply for work and labor, but should be rewarded liberally to encourage others to hazard life and property in the rescue of imperiled vessels and cargo and the preservation of life. It is generally held that to limit such compensation to the mere cost of performing the services by a less expensive agency would be to discourage the enterprise and efforts of those best equipped to render the necessary aid, and thus result in increasing losses from perils of the sea. While there was no hazard of life nor any great danger to the rescuing vessel in rendering aid to the Pelican, and while there was no immediate, imminent danger to the Pelican, the time of year and circumstances before adverted to nevertheless impress upon those services the right to salvage compensation. In the uncertainty of the weather and the condition of the schooner, together with the lateness of the season, while it is not certain, yet it

may be fairly assumed that there was no little danger before the Pelican could be reached by other aid, her provisions would give out, and it is not unlikely that she might have been locked in the ice beyond the possibility of rescue. The day after her arrival at her anchorage, the light on Cariboo Island had been extinguished for the season. There were no inhabitants on that island, and none nearer than Michipicoten, some 20 miles to the northward. The latter island was inhabited by a few fishermen, but it had no means of communication with the main land, except a small tug which had taken off the lighthouse keeper from Cariboo Island on the day of the Pelican's arrival there, and had gone to Michipicoten, where she lay storm bound for eight days after leaving Cariboo Island. After the Wocokoken's arrival at Sault Ste. Marie, her master had dispatched a tug to search for the Pelican and bring her in, and the tug left for that purpose on Monday noon. This tug, however, had not passed White Fish Point when she met the Pope having the Pelican in tow. This was on Wednesday evening, November 25th. Crediting the tug with having made all proper efforts to perform her duty under her employment, this would indicate that the weather was such as to prevent her going beyond White Fish Point, which is some 40 miles to the southward of Cariboo Island. It is argued that the tug would have brought the Pelican in for $300, and that this was the value of the towage services. By the contract under which the tug went out, she was to have $300 if she brought the Pelican in within two days, and $150 per day for every additional day spent in the search and rescue. It would not be just to measure the value of the Pope's services by this standard. The tug's employment was in the line of business in which she was engaged, and, while she could perform that service profitably at the agreed rates of compensation, it is by no means certain that she would have found the Pelican at once, or would have been able to bring her in the weather then prevailing. It is claimed that the Pelican might safely have lain to anchor where she was until a favorable wind should come when she might have run unaided to the Sault. But I cannot bring myself to believe that her master regarded this as feasible, or he would have made the effort. The fact that he volunteered to slip his anchor to avoid detaining the steamer in order that he might insure her aid is suggestive that he regarded the situation of his vessel under all the circumstances as one calling for prompt assistance.

In performing this service the steamer actually lost during its rendition at least a full day of her time before she took the Pelican in tow. An immediate consequence of this loss of time was her detention at the Sault for at least half a day, as she had to await her turn in going through the canal, and was thrown behind other vessels in entering the locks. The direct result of this was to compel her to stay at the Sault to November 26th, since a snowstorm intervened before she could get through the locks, which prevented her from continuing her voyage. While ordinarily a subsequent detention of this sort is not regarded as a proximate cause in the sense of being an element for salvage compensation, yet this was so immediately con-

nected with the rescue of the schooner as to be fairly an incident of that service, and equitably entitled to consideration in measuring its value. The Pope's earnings were about $700 per day gross. Her expenses were about $180 a day. In towing the Pelican she supplied and used her own new hawser, as the Pelican had no tow line. The testimony is that the use of such a hawser in this service was worth from $100 to $150.

There is merit, also, in the claim made for the libelants that in deviating from her voyage to take the Pelican in tow the insurance upon the hull, at least of the Pope, was imperiled, and that this is a circumstance that ought to be considered in measuring the reward. While there was not an imminent danger of the loss of the lives of the Pelican's crew, and while the risk run by the Pope in these unfrequented waters was not great, and there was no peril to the lives of the crew in performing the service, yet, in view of all the circumstances narrated and the fact that the service was expeditiously performed and voluntarily rendered in response to a flag of distress, which called for it, and in view of the value of the property, some $325,000, put at hazard in the work of rescue, the time necessarily lost by her in its performance and the value of the use of the hawser, $1,300 would seem to me to be a fair though not a liberal, compensation, and that amount, with costs is awarded the libelants for salvage. The claim made by libelants that the Pope, by this detention, was subjected to storms which detained her, causing the loss of two days' time, which but for this detention would not have been suffered and that such detention, necessitated the extra insurance paid by her owners to cover the risk for the two days after the close of navigation, are consequences too remote and conjectural to be entertained as separate elements of compensation, and would seem to be fairly met by the allowance made.