## THE WESTERN STAR.

### (District Court, W. D. Wisconsin. December 9, 1907.)

### No. 35.

**1. Salvage—Compensation—Elements in Determination of Amount.**

The important considerations affecting an award for salvage service are whether the aided vessel could have saved herself or was in probable danger of destruction or serious injury, and, if so, her value, the degree of her danger, and what was saved; also whether the service was rendered with promptitude, skill, vigor, and energy, and was successful, the danger and hazard in rendering the service, the value so risked, the time spent and its value, and the damage or loss to the vessel by which the service was rendered. The award should also be made with reference to the rule that remuneration should be liberal, to encourage similar services in other cases.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, §§ 57-66.]

**2. Same—Rescue of Stranded Steamer in Lake Superior.**

The steel freight steamer Western Star, without cargo, stranded on the south side of Lake Superior on November 29th during a very severe gale. On the next day, after the storm was over, a passing steamer was signaled for assistance, but continued on her course. The following day, when the master and a part of the crew had gone on shore for assistance, the steamer Viking sighted the Star, came near, and offered her services, which were accepted by the officer in charge. A line was passed to the Star, and after some hours of work, during which the Viking also became stranded on a newly formed bar, where she remained for half an hour, she succeeded in pulling the Star off, and the latter proceeded to port alone. The Viking, with cargo and freight, was worth $88,000. She was detained eight hours by the service, suffered some damage, and ran a considerable risk of further injury by stranding. The Star was worth $265,000, and was damaged by the stranding to the extent of $8,-000. She was covered with ice, and, although not in immediate danger, was in considerable peril, owing to the uncertainty of the weather at the season and her exposed position, and her ability to extricate herself was doubtful. The master, while on shore, had hired a tug at $250 per day, which had started for the Star and was paid for three days' service. There were many other disasters on the lake, due to the storm, and it was difficult to secure wrecking vessels. After the service was rendered the owners of the Star offered to pay the Viking $1,000 therefor, which was not accepted. *Held*, that the service was a salvage service of merit, skillfully and successfully performed, and that the Viking was entitled to an award of $5,000 therefor, including therein $150 for damage to her equipment.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, §§ 72, 73.

Awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

In Admiralty. Suit for salvage.

H. R. Spencer, for libelant.

Shaw, Warren, Cady & Oakes, for respondent.

SANBORN, District Judge. Libel for salvage. The Western Star is a steel freight steamer, 412 feet in length, 50 feet beam, and 25 feet in depth, 7,000 tons burden. She was built in 1903, at a cost of $265,-000, and was worth that sum at the time she was stranded, November 29, 1905. She left Toledo, Ohio, for Ft. William, Canada, in the lat-

ter part of November, without cargo, in command of Capt. Patrick J. Griffin. During the evening of November 27, 1905, while near Isle Royale, she encountered a heavy northeast gale, the worst storm ever experienced on Lake Superior. With her ballast tanks filled with water, and water put in her main hold, together weighing about 3,000 tons, she was kept alternately on a northwest and southeast course, until about 3 a. m. of November 29th, when she went aground stern first on a sandy bottom in the bight of the bay on the south shore of the lake, with her port side towards the shore, about a mile and a half east of Fourteen Mile Point, 20 miles from Ontonagon, Mich. She was in 14 feet of water about 300 feet from the shore, which at that point curved slightly, so that the vessel was protected from winds except from the northwest, north, and northeast, although greatly exposed to the winds prevailing at that season. She was without supplies. A tug was hired at Ontonagon at an expense of $300 to bring groceries, etc. The storm continued to break over her for some hours, with the temperature below zero; but five or six hours after she went aground a sand bar formed outside, distant about 150 feet, by which she was considerably protected. This bar was 24 feet wide, with a depth of 8 feet. Ice formed over the vessel to a considerable thickness, so that she looked like an iceberg.

In the afternoon of the same day the storm had somewhat abated, and the first officer and five seamen reached the shore in a small boat, and walked to the lighthouse at Fourteen Mile Point, where they spent the night. Early the next morning they started on foot for Ontonagon, 18 miles away, and reached there about midnight. On the 1st of December the storm was over, and the captain was rowed to Ontonagon, leaving the Star in charge of the second officer, Capt. John Symington, and 11 men. He had sailed 32 years on salt and fresh water, and had been a licensed officer on the Great Lakes for 16 years. At Ontonagon a large wrecking tug, the Reid, was engaged from Sarnia to assist the Star at an agreed price of $250 per day. Capt. Richardson also testifies that the Star offered the Great Lakes Towing Company $15,000 to send an expedition to her, but that all the wrecking outfits on Lake Superior were otherwise engaged. The source of his knowledge or information he does not state. When leaving the vessel the captain told Capt. Symington to let any boat which might come along pull on the Star. The day after the Star went ashore the steamer Victory was sighted at a distance of a mile and a half or two miles, and a distress signal was sounded by the Star. The Victory came in pretty well up to the Star, and then continued on her course. At this time the storm was over, and the lake quiet.

The Viking, in command of Capt. Richardson, the libelant, is a steel steamer 214 feet long and 37 feet wide, drawing 14 feet, and was at the time in question worth $75,000, with a cargo worth $11,500, and her freight amounted to $1,610, making a total value of $88,000. She was engaged in towing barges and freighting. About 1 o'clock p. m. December 1, 1905, the Star was sighted by the Viking. She directed her course towards the stranded vessel, until warned of the bar which had formed. Capt. Symington and the Star's engineer went on board the Viking, and after some conversation as to the situation the master of

the Viking offered assistance, which was tacitly accepted. Before the Viking appeared Capt. Symington thought he could release the vessel without assistance, and she was then being pumped out. For this reason the Star did not sound a distress signal, although the assistance offered was accepted. A tow line belonging to the Viking, 1,000 feet long, was used. Some of the crew of the Star went out in a small boat and took hold of the line, and one end was hauled on board the Star. The Viking pulled from various directions, swinging backward and forward, so as to avoid a straight pull. After pulling for some time she got aground on the bar, by reason of her position and the current and by swinging back and forth. The Star then let go of the line. After considerable effort for 20 or 30 minutes the Viking got off the bar. The line was again taken aboard the Star, and after pulling in the same manner for some time longer the Star was loosened from the sand, and by turning the propellers of both boats a channel was cut through the bar, and the Star towed out stern first to anchorage in deep water. This was about 6 o'clock, some five hours after the Star had been sighted. Capt. Richardson, thinking the Star was not sufficiently manned, offered to tow her to Duluth or other port, which was declined. The Viking then proceeded on her course, but after going about two miles turned back and offered to stand by until Capt. Griffin should return. This offer was declined. Capt. Richardson proposed to stay alongside until the captain's return, but Capt. Symington told him if he did so he would go to Portage Canal with her. Finally the Viking left, about 9:30 p. m., and continued on her course to Duluth. The next day the Star steamed to Ontonagon, took on her captain and his men, and later went to Duluth for the winter. Her machinery was somewhat damaged. Two of her steel plates were taken off on account of the rivets having been loosened. It cost $8,000 to repair the vessel.

The libelant claims actual damages for injury to the tow line, $300; breaking the crank pin, $545.72; injury to the air pump, $50; and loss of the carriage of a cargo of lumber from Duluth to Cleveland, $2,670. The use of the tow line was worth $100. As to the crank pin, it appears that when the vessel was overhauled the next spring it was found broken. When or how it was broken does not appear. There is a possibility that the injury was caused by the heavy strain of pulling on the Star, but this is entirely uncertain. In respect to the lost charter, the claim is that the Viking did not get to Duluth in time to load the lumber before the insurance ran out, and the lumber was taken by another steamer. The evidence leaves it in uncertainty whether the Viking would have been able to have obtained dock room and loaded this lumber, even if she had not been delayed by the salvage service. This damage is too remote to be taken into account. The same rule applies to the crank pin. No one can say whether it was injured in pulling on the Star or not. The damage to the air pump was caused by taking in sand during the salvage service, and is a proper item of loss to be considered.

The libelant claims $25,000 for the salvage service, and the respondent offered him $1,000 as the fair value of the services. The rules governing allowances for salvage services are fully settled and have been applied by the courts in a great number of cases. The important con-

siderations affecting a salvage service are whether the aided vessel could have saved herself, or was in probable danger of destruction or serious damage, and, if so, her value, what was the degree of danger to the vessel aided, and what was saved; also whether the salvage service was rendered with promptitude, skill, vigor, and energy, and was successful, what was the danger or hazard in rendering the service, and what was the value so risked, the time spent, its value, and the damage or loss to the vessel by which the service was rendered. The Blackwall, 10 Wall. 1, 12, 19 L. Ed. 870; Adams v. The Island City, 1 Cliff. 210, Fed. Cas. No. 55; McConnochin v. Kerr (C. C.) 15 Fed. 546; The Hyderabad (D. C.) 11 Fed. 749; Sinclair v. Cooper, 108 U. S. 352, 2 Sup. Ct. 754, 27 L. Ed. 751; The Jessomene (D. C.) 47 Fed. 903. To this enumeration it may be added that admiralty awards are not confined by the rule of quantum meruit; but perilous services voluntarily rendered should be liberally rewarded, as an inducement to similar services by others. In the interest of commerce and navigation the courts should grant liberal remuneration, to overcome the universal reluctance with which such services are undertaken, in view of the dangers attending them. The Blackwall, 10 Wall. 1, 19 L. Ed. 870; The Pontiac, 1 Newb. 138, Fed. Cas. No. 8,801; The Elvira, Fed. Cas. No. 6,015; The Elfrida, 172 U. S. 186, 19 Sup. Ct. 146, 43 L. Ed. 413; The R. R. Rhodes, 82 Fed. 751, 27 C. C. A. 258; The I. W. Nicholas (D. C.) 147 Fed. 793. In this case an allowance of 1 per cent. of the value aided was made, although the salvage service was unsuccessful. The Lasca (D. C.) 133 Fed. 1005; The Edith L. Allen, 129 Fed. 209, 63 C. C. A. 367; The James Turpie (D. C.) 113 Fed. 700; The North Erin (D. C.) 71 Fed. 430; The Pelican (E. D. Mich., 1893) reported in 158 Fed. 183. Further, it should also be taken into account, although perhaps of minor relative importance, whether the owners of the property saved have acted reasonably in offering reward, or so unreasonably that the salvor is compelled to assume the delay, vexation, and expense of litigation to establish his rights.

While the Western Star was by no means hopelessly lost, she was in a position of great danger. She lay on her port side on the bottom, covered with ice, out of the general path of navigation, on an exposed shore, subject to a sweep of 200 miles of sea, in danger from storm and ice, at the beginning of winter, in calm weather, but in the utmost uncertainty as to its continuance. There were many other wrecks to be aided. She was considerably damaged, the expense of repair being $8,000. The Star is said to have offered $15,000 to the Great Lakes Wrecking Company to send a wrecking expedition, but it was engaged by others. However, the large wrecking tug Reid was engaged at Sarnia for $250 per day, and started on her mission, reaching Sault Ste. Marie December 3d, where she was stopped by telegraph; the Star having been released. She was paid for three days. She could not have reached the Star until December 4th, and it was wholly uncertain what the weather would have been at that time and whether the Star could have been rescued. The case of The Elfrida, 172 U. S. 186, 19 Sup. Ct. 146, 43 L. Ed. 413, is like that of the Western Star in respect to the situation of the stranded vessel. She was not in imminent peril, but in serious danger unless released before a heavy storm. An-

other case quite closely in point is The R. R. Rhodes, 82 Fed. 751, 27 C. C. A. 258, in the United States Court of Appeals for the Sixth Circuit, per Taft, C. J.

It is possible that the Star might have gotten off by her own exertions, but this is quite doubtful. She was hard and fast on the bottom, one-half of her length substantially buried in the sand, and listed two feet to starboard. Lying with her port side towards the shore, in trying to release herself by backing, she would be unable to move, since a steamer with her prow fast "backs to port." There was a slight current, running aft along the shore, which might possibly have helped a little. Whether she could have gotten off is wholly uncertain, as much as what might have happened to her if aid had not been given. It seems entirely fair to say, therefore, that the Star was rescued from a position of considerable danger.

In respect to the character of the services rendered, the master of the Viking, Capt. Richardson, is an experienced and able seaman, of long experience, skilled in navigation and towing, inured to all the dangers and hardships of navigation on sea and lake. He saw a large and valuable steamer in peril, and rendered prompt and efficient service. It is true that such service did not involve the utmost danger to his vessel, yet it was a service which many experienced masters would have declined. It is a well-known fact that seamen are quite reluctant to take the risks of such a situation. One vessel, although signaled for help, refused to offer it. Probably nine out of ten would have done the same. His vessel was much smaller than the Star. He drew 14 feet of water. A sand bar 24 feet wide had formed outside the Star, and 150 feet away, with 8 feet of water over it, and there was danger that the Viking would go hard and fast on the bottom, as she did. There was great danger that she would not be able to get off. There was also the risk of disabling herself by the breaking of machinery, and this is emphasized by the fact that her crank pin was found broken when she was overhauled the next spring. She might have fouled the line and broken her propeller. From these considerations it is clear that the element of heroism is present, and that the claim of the respondents that Capt. Richardson was merely an officious busybody, anxious only to get a large salvage allowance, is unfounded. He risked the whole value of his vessel, cargo and freight, $88,000, and his services were prompt, unhesitating, skillful, vigorous, and successful. As Judge Taft said in the case of The R. R. Rhodes, 82 Fed. 751, 754, 27 C. C. A. 258:

"We think it is very probable that nothing but the prospect of a substantial reward would have induced the captain to run the risks which he certainly did run in going to the relief of the Rhodes."

In the Rhodes Case there was additional danger from boulders in the bottom of the lake about the place where the service was rendered.

The time occupied in rescuing the steamer was two or three hours, but the Viking did not continue on her voyage until eight hours after the Star was first sighted. The Viking made repeated offers of further assistance after the Star came to anchor in the open lake, which seem to have been prompted, at least in part, by the fact that the captain

and mate of the Star, with six seamen, were absent. There was also some damage to the Viking, due to her efforts in pulling off the Star. The tow line and air pump were injured, and the crank pin was found broken when the vessel was overhauled, and this may have been due to the heavy strain upon it in pulling on the Star. Possibly, also, the freight on the lumber was lost, though this is uncertain. While the claims for damage to the crank pin and for loss of the charter are too remote to justify their allowance, they may be taken into account and have some slight influence in arriving at a fair allowance for the services rendered.

Respondent made an offer of $1,000. In view of the large amount of property in danger on both sides, amounting to $350,000, the damage to the Viking, and the well-established rule of liberality in valuing salvage services, this offer was manifestly inadequate. The libelant was obliged to bring suit, incur the expense of attorney's fees, and the consequent vexation and delay. It is now two years since the salvage service. There will be a loss to libelant in interest and attorney's fees of probably $1,200 to $1,500, if not more, or 25 per cent. of the sum now awarded. Vessel owners should be more prompt and liberal in their payment and settlement for salvage services. If a reasonable offer had been made, libelant could afford to have accepted three-fourths of what he will now obtain, upon the basis of the amount herein awarded. It is true that the libel claims $25,000, which seems excessive; but the proof does not show what Capt. Richardson offered to accept, or that the claim of $25,000 is anything more than a lawyer's estimate, extended to cover possibilities. As a matter of course no interest nor damage for delay can be allowed. A claim entirely unliquidated does not bear interest. But, in order to encourage promptitude and reasonable liberality on the part of owners of property saved, the courts should, in making awards, take into consideration any circumstances of the particular case bearing upon these matters, both to encourage a speedy settlement of salvage claims asserted in good faith on the one hand, and also to discourage the making of exorbitant demands for salvage on the other. I do not lose sight of the fact that respondents have been disposed to treat the services rendered by the Viking merely as so much labor, and not as salvage services at all. But in view of the large values involved, and the very considerable risks on both sides, I think they should have been more liberal, and should have regarded the matter in the light of a salvage service.

In view of all the facts, the sum of $4,850 should be allowed as a reasonable, although not liberal, salvage award. In addition to this, $150 will be allowed for damages to the tow line and pump.