## THE JELLING.

### THE WILLIAM COBB.

(District Court, E. D. North Carolina, New Bern Division. September 27, 1918.)

#### No. 93.

1. SALVAGE ⬤═29—AMOUNT OF AWARD—RESCUE OF DISABLED VESSEL AT SEA.
    An award of $4,000, made to a steamship worth, with her cargo, $2,-700,000, for the rescue of a schooner and cargo worth $12,000, from a point 50 miles off the North Carolina coast, where, after being driven 600 miles and disabled by a storm, she would have soon sunk, and was in effect abandoned by her crew, who came in a boat with their effects on board the steamer when she approached.

2. SALVAGE ⬤═26—ELEMENTS OF COMPENSATION—COST OF SERVICE.
    While the actual expense and loss of time of a salving vessel do not constitute claims for which payment may be demanded, they are items to be considered in fixing the amount of salvage compensation.

3. SALVAGE ⬤═26—ELEMENTS OF COMPENSATION—VALUE OF PROPERTY SAVED.
    Although the value of the salving vessel and of the time lost from her voyage may be large, yet the salvage award must be governed to a large extent by the value of the property saved.

In Admiralty. Suit for salvage by Carl F. Andersen, master of the Danish steamer Jelling, and others, against the schooner William Cobb. Decree for libelants.

John D. Bellamy, of Wilmington, N. C., and J. P. K. Bryan, of Charleston, S. C., for libelants.

Julius F. Duncan, of Beaufort, N. C., for vessel owner.

J. O. Carr, of Wilmington, N. C., and Harrington, Bingham & Englar, of New York City, for cargo owner.

CONNOR, District Judge. The Danish steamer Jelling, owned by the Steamship Company Dannebrog, 2,639 gross and 1,673 net tonnage, 284 feet long, 42 feet beam, value about $2,000,000, Carl F. Andersen, master and agent, was on October 25, 1917, under charter to the Ward Line, at the rate of $40,000 a year, carrying a cargo of hemp, mahogany, cedar, etc., of 1,200 tons, valued at $700,000, on a voyage from Progreso to New York, passing up the coast of North Carolina, off Cape Lookout.

The Schooner William Cobb, an American vessel of 435 tons gross and 345 net, about 200 feet long and 30 feet beam, of the appraised value of $6,500, was carrying on October 25, 1917, a cargo of lump coal (500 tons) of the value of about $5,400. She sailed from Newport News, Va., October 11, 1917, for Ponce, Porto Rico. On the 18th day of October, when 150 miles southeast of Bermuda, she encountered a severe storm, described by members of her crew as a "tropical hurricane," which "brought the seas right over her decks continually," lasting about two hours, followed by heavy wind and rain, which continued about eight days. A member of her crew says:

"Her condition was getting worse. The crew didn't have to work night and day for the first three days, but after that they didn't know what it was to sleep. We had both hand pumps and gasoline pumps working. We had trouble with our pump continually; that was the aft pump. The forward pump was in good condition. We were kept working continually. We were pretty well puzzled as to where we were drifting, because we could not get a sight for four or five days. At times we did not know where we were. We went along doing as seamen should for the safety of navigation, pumping out our vessel and getting what sleep we could. There were times when we had no sleep, working as much as 22 out of the 24 hours to save our vessel. We watched for five days for a vessel to come along, but we couldn't see anything. One vessel passed us; we had signaled her, but she had never stopped. * * * On October 25th the vessel was leaking badly. We had already pumped her out at 3:30 in the morning, but the water was coming in at the rate of about six inches an hour. * * * The storms were so terrific at times that it was hardly possible for us to work our big pump. The sails at times, before we were able to get them in, had done away with one of our jibs, and another time it broke one of our brooms. The sails would not act at all. We merely kept up what sail we could to steady our ship; one gaff and one boom were broken."

Another member of the crew says:

"The storm was severe, and naturally the ship was leaking a little bit, and the storm makes her leak more, and the leaking was in the bow. Naturally by the storm we couldn't keep up to the wind, and we had to keep up to the wind for our course; but we couldn't do it because, every time a sea would come over, all the water would come through the bow, so we had to keep her off, and run her before the wind to keep her from sinking. We were trying to keep her from sinking for about seven days, pumping day and night. The storm took the flying jib. The foregaff was broken. The pump, before we left port, was not in proper order. The captain's mistake; he forgot. He took the measure for the top plunger, but when we went ashore he forgot to

bring it; for the pump to pump, we had to get on top and hold a broom down to hold the pump down. The hand pump could not keep the water down."

Capt. Sabean says that:

"The storm raged with great severity for about 36 hours. It continued to blow with severity, but not so great, up to the 23d of October; pumped both day and night to keep the water down; did this up to two days before the 25th. A couple of days before the 25th one of the pumps was put out of commission."

On the morning of October 25, 1917, the schooner was on the North Carolina coast, about 50 miles from Cape Lookout, and about 600 miles from where she first encountered the storm. The steamer Jelling was on her voyage to New York. The schooner was showing her distress —signal flag upside down. Capt. Sabean says:

"Between 2 and 3 o'clock on the morning of the 25th we sighted the steamer. I ordered my torch to be burned in order to communicate with the steamer. She came down on us about 3:30 a. m. * * * I shouted, and, as near as I could make out, the captain asked me what was the trouble. I said back that my vessel was in a sinking condition and would like to have some assistance, if not to be taken off my vessel. Some of my crew shouted out that the vessel was sinking, and I said, 'Don't shout out that we are sinking, because we are not, but sing out, if you want to say anything, and say we are in a sinking condition.' "

Capt. Andersen, of the Jelling, says that about 2 o'clock on the morning of the 25th of October, his second officer, on watch, sighted on the port bow a distress light of an unknown ship; called his attention, he being asleep; came at once; determined the vessel's course from the distress light; steered towards the schooner for about an hour; ten miles away, closing up under the stern of the vessel, heard some one shouting; could not understand what was said; used my megaphone, asking, "What is your trouble?" Answer came, "We are sinking and want to be taken off"; turned my vessel around, and distress signal was again shown on schooner's stern; came again close, and through megaphone asked, "Are you in imminent danger there? I will help you off, or can you wait until daylight?" The captain answered back, "Yes." Some of the crew said, "No; we want to be taken off right away." Turned my ship around and came near the ship's stern again. Still very dark, and very high sea; found that the schooner had lowered her boat and the crew got into it; asked, "Are you coming over in your own boat?" "Yes," was the reply; answer, "All right; we will stand by you." The boat was between the steamer and the schooner, on the off, or port, side of the steamer; ordered the boat to go round on her lee side, where there was smooth water.

Capt. Sabean, concurring substantially in the statement of Andersen, says that he told his men to put their clothes in the boat; there were provisions and water in the boat; to lighten her, ordered the water vessels thrown overboard; put his own clothes, chronometer, compass, charts, and some other little instruments; did this in case the captain would not give his tow line; would have to leave his vessel, because he did not think it safe to stay aboard, if he could not get any assistance, as his after pumps had been put out of commis-

sion by the storm and his gasoline was about gone; had no way to get to a port and was about 50 miles from this port. I said:

"We will leave our side lights up. leave her sails up. and have a light on her stern, so nothing will collide with her. We will not set the vessel on fire, will not destroy her, until I can see what the captain will do for me. If he doesn't give me any assistance, will not tow her; we would come back and spill what gasoline we had forward, and touch a match to her and burn her up."

The testimony in respect to the action of both captains, up to this point, is corroborated by all of the witnesses. Among other things taken over in the boat were the clothes of the crew and a parrot. When the small boat reached the lee side of the steamer, by direction of the captain and officers of the Jelling, several of the crew went on her by the ladder, and others were hoisted up with the boat by the tackle of the Jelling. The contents of the boat were taken off. There is some, although not material, difference of opinion in regard to the condition of the sea when the boat went to the side of the steamer. There was some swell, but "not heavy." The boat encountered no difficulty in going to the side of the steamer, as directed.

[1] Eliminating, for the moment, the testimony in regard to which there is some contradiction, it is conceded that the captain and crew of the schooner were invited to come on board—were given coffee and sandwiches; that the men were very weary and much exhausted by their experience on the schooner, and went to sleep. They reached the steamer at about 4:30 o'clock in the morning. Capt. Sabean says, after he boarded the steamer, and the small boat was hoisted up:

"I went up on board, shook hands with the captain, stopped there a few minutes on the main deck, and he and I went up on the second deck, where his chart room was. In his chart room, he and I went over the position we were in and our nearest port, and I approached the question to him that I would like for him to put a line to my vessel; but he didn't give me any decided answer about it. A short time after the subject was brought up again about doing something for my vessel, and in the conversation we were having the captain said, 'I will not put a line to your vessel unless you give me full charge.' I said, 'Captain, can't we make some arrangements; I am helpless, don't want to lose my vessel, and by having some gasoline' and your assistance my fore pump will keep my vessel afloat, if it helps this vessel to reach port.' He said, 'No, captain, we cannot make any arrangements; the courts will have to decide that.' I said, 'If we could make an agreement, why would we have to settle in the court?' He said, 'I have got two owners; the vessel is owned by some people, and she is chartered by other people, and I would have to let them decide.' I said, 'I am willing to pay you a reasonable price to take my vessel in, or I will pay you at the same rate, whatever your vessel may be now earning, for the time of the service.' We could not come to any agreement, and rather than not have him put any line on my vessel at all, I agreed, or had nothing more to say at that time about saving my vessel, but let him go ahead and put his line aboard if he would."

Capt. Andersen says that, after the captain and crew of the schooner came on the steamer, he made up his mind to keep around her until daylight to investigate her condition. At about 6 o'clock he sent his chief officer, third engineer, a carpenter, and three seamen to the schooner to investigate conditions, take soundings in her bilges, and see if there was any possibility of saving her. They returned

about 7 o'clock and reported that she was an old vessel, in good condition, but had five feet of water in her hold and leaking heavily; thought it would be difficult to save her under the circumstances; the motor pumps were out of order; none of them were working; that he thought it would be possible to repair the forward motor pump and get it to run. He called his officers together on the bridge and consulted them in regard to trying to save the vessel. They agreed to try to do so. He says that, up to this time, nothing had been said to him by Capt. Sabean about saving, or towing, the schooner.

"When he saw I had a meeting of my officers about 7 o'clock, he came to the lower bridge and said, 'Are you going to save her?' I replied, 'I don't know, captain; I might do it.' He asked me how much towage would cost. I said, 'I don't know.' He said, 'Well, could you take her in for $5,000 or $6,000, which I could pay if you started towing her?' I said, 'Captain, you are aboard her now, and I don't know if I will save her; but, if I do take her in tow, the costs must be left with the proper authorities, if I get the ship into a safe port.' He had never asked me to tow her in any way. I personally decided to take that vessel in tow; he had never offered, or asked me, such a question about turning her over. When the captain came on board, it was about 7 o'clock, he asked me; but I told the captain that, if he and his crew was on board the ship, then I could not take the ship in tow, as there could not be any salvage money near the value of the cost of my ship, and delay and expense, and that I would not tow her into port under the present condition, if he stayed on board the ship. He never asked me for any gasoline."

There is evidence tending to corroborate both captains in regard to this conversation and the time at which it occurred. The weight of the evidence brings me to conclude that the conversation took place at the time fixed by Andersen. When the crew reached the steamer at 4:30 in the morning, they were physically exhausted; after getting coffee and sandwiches, they went to sleep. I am of the opinion that, when they left the schooner, they did not expect to return, or that it would be saved. The thought of towing, I think, came when Sabean found that Andersen had sent his men to examine the schooner and her condition, and heard the discussion and decision of Andersen and his officers to try to save her. This was natural and proper. Upon finding that there was a chance of saving his ship, it was his duty to the owners to try to make terms with the salvors. Andersen instructed his officers and seamen to get their breakfast and go aboard the schooner. At about 9 o'clock, they went aboard her with one day's rations and 10 gallons of gasoline.

Loeber, second officer of the Jelling, went to the schooner with Nielson and three sailors. He says:

"The pumps were in poor condition—would not work; told Nielson to go to work on them; took the sails down; foregaff was broken in two places; main boom was broken; at the aft pump water was about 4 feet 6 inches; at forward pump, about a foot and a half over the keelson; caulked the hand pump; water was rushing in; the two sailors worked the hand pump. The steamer came near, and we connected the hawser to the schooner and proceeded to tow under slow speed, in order not to part the hawser line; proceeded to Beaufort, the nearest port; she was leaking heavily, and the men were working the pumps; at about 11 o'clock proceeded under faster speed. At about 2 o'clock afternoon, reached Cape Lookout light vessel; water pump-

ed down to two feet, and sea had become smooth; from 9 o'clock a. m. until noon thought schooner could not be saved, and came very near abandoning her; water poured in so rapidly. At about 6 o'clock p. m. flashed for a pilot in bay of Cape Lookout; came at 6:35; the schooner was anchored at 7 o'clock; pilot advised not to enter bar during dark hours; second officer came on board steamer for consultation; said two feet water still in bilges; would have to pump all night; needed more gasoline, which was given him; got two pilots for both schooner and steamer. At 7:35 a. m. passed over bar of Beaufort; at the same time the schooner grounded and the hawser parted. In order to keep the vessel in position, her starboard anchor was dropped, with 15 fathoms cable. The pilot proposed to send a tug to save the schooner when it came at high water, but I told him that I would come back with my steamer and take her in myself. He said that it was a dangerous job; the tide was running at four knots, and the channel was very narrow, and the ship could not swim. Proceeded in the harbor with steamer; turned her around; came around and returned in the harbor; went over the bar again, and came back and anchored just ahead of the schooner standing at the bar; got a new tow line on schooner. The vessels were then in a very critical position, both vessels, about 10:30, as the wind changed from northeast to southeast, with a strong wind. At 11 o'clock ordered to cut the cable on the schooner; its motor windlass would not lift the anchor; when released from her anchor, the Jelling proceeded slowly ahead, the schooner floated, and at 11 a. m. she was anchored in Beaufort harbor. The cable was cut, because the vessel was in such a position that the anchor, which was standing from the starboard towards aft, could not be lifted with the schooner's motors and windlass. It was in bad condition—the steamer was in a critical condition and had to cut the cable; otherwise, it would have been stranded on the bar, and the schooner might have stranded as well, and possibly we would have torn a hole in her."

There was some contradictory evidence in regard to condition of the sea; it was "choppy"—not unusually rough. The schooner was turned over to the marshal on the 28th at 8 o'clock a. m. The captain and crew of the schooner remained on the steamer until she came into Beaufort. They were not requested, nor did they offer, to assist in bringing the schooner into port. The steamer consumed about 35 tons of coal in handling the schooner, worth $8 a ton, and 50 gallons of engine oil. The hawser was worth $355. A rail on the starboard side of the steamer was broken, worth about $50. The board of each of the crew of the schooner was worth $1.50 a day. The schooner was appraised at $6,500, and released upon bond. The coal was sold at public auction for $11.25 per ton, weighing 490½ tons, aggregating $5,518.12.

Libelants insist that the schooner was abandoned by her crew, and was, at the time she was taken in charge by the crew of the Jelling, a derelict. Respondents insist that the crew did not abandon her; that they intended, when they left to go to the Jelling, to secure her services in towing the schooner into port; that with a supply of gasoline they could have kept the water down. The evidence tends strongly to show that, in the absence of aid, the schooner would have sunk in a short time—a few hours. I am constrained to think that this fact was recognized by her captain and crew; that they were exhausted physically, and knew that their pumps were in "bad condition." They did not, in my opinion, formed upon considering all of the testimony and their conduct, expect to return to the schooner, except possibly to burn her, to prevent her becoming a menace to navigation. I do not doubt that, but for the action of the captain

and crew of the Jelling, she would have, in a few hours, been a total loss. It is not very material to inquire whether, under the conditions disclosed, she was a derelict. She was certainly in imminent peril—as her captain said, "in a sinking condition"—when overtaken by the Jelling on the morning of October 25th.

In view of the small value of the property saved, much less than libelants supposed at the time they undertook the work, as compared with the value of the steamer Jelling and her cargo, the amount of her earnings per day under the charter, and the time consumed in bringing the schooner into port, there is but a small margin for a bounty to the libelants. While but little aid is derived from adjudged cases, each depending largely upon the peculiar conditions, I find a very satisfactory statement of the principle or rule by which courts are guided in making awards, under conditions somewhat similar to those disclosed in this case, laid down by Judge Sanborn in The Western Star (D. C.) 157 Fed. 489. He says:

"The important considerations affecting a salvage service are whether the aided vessel could have saved herself, or was in probable danger of destruction or serious damage, and, if so, her value; what was the degree of danger to the vessel aided; * * * also whether the salvage service was rendered with promptitude, skill, vigor, and energy, and was successful; what was the danger or hazard in rendering the service, and what was the value so risked, the time spent, its value, and the damage or loss to the vessel by which the service was rendered. * * * Further, it should also be taken into account, although perhaps of minor relative importance, whether the owners of the property saved have acted reasonably in offering reward, or so unreasonably that the salvor is compelled to assume the delay, vexation, and expense of litigation to establish his rights."

Applying this standard for measuring the amount which should be awarded to the Jelling, it is manifest that the schooner was in imminent danger, without the aid rendered by the Jelling. She would have sunk very soon, resulting in total loss. The value of the schooner and her cargo is ascertained by appraisement and public sale. The value of the Jelling and her cargo, fixed by her master, is not controverted; they were, as compared to the schooner and her cargo, large.

I am unable to find that either the crew, or the steamer, or her cargo were in any serious danger, by reason of the deviation and service rendered. I am not impressed with the suggestion, somewhat exaggerated, that the sea was very "rough," or that there was any unusual "swell." The boats had no difficulty in going to and from the two ships. The schooner followed the Jelling, when taken in tow, without difficulty.

The service was rendered promptly, and with skill and energy. I do not think that there was any delay for which the captain and crew of the Jelling can be criticized. The service was skillful and, in all respects, successful. The question which has given me most concern is in fixing the amount which should be awarded by reason of loss of time sustained by the Jelling in rendering the service. Fixing the beginning of the period at, approximately, 2 o'clock on the morning of Thursday, October 25, 1917, that being about the hour at which she sighted the schooner, and stopped on her course, she completed the service—anchored the schooner in Beaufort harbor—at 11 o'clock Friday morning, October 26th. She took on a supply of coal at about noon

Saturday, October 27th, and on the same day filed the libel in the court at New Bern, about 37 miles distant from Beaufort, with a railroad connection—having two trains each day. The libel was served, and schooner taken into custody by the marshal, at 8 o'clock on Sunday morning, October 28th. The captain remained at Beaufort, for the purpose of having the deposition of himself and his crew taken, until the night of Monday, October 29th, getting back on his course at 10:30 p. m. of that day.

Passing the question whether, after anchoring the schooner at Beaufort and getting a supply of coal, he should not have placed one or more of his crew on the schooner, until an effort could be made to agree upon a reasonable amount for the service, or a libel filed, it is clear that he was entitled to remain at Beaufort until he secured and took on coal, noon of Saturday, October 27th. Conceding his right to await the coming of the marshal on Sunday, October 28th at 8 o'clock a. m., it would seem that, in view of the large expense incurred by the delay, he should, at a favorable condition of the tide, have resumed his voyage not later than midday of Sunday. He brought the schooner in on full tide at 11 o'clock on Friday. There is no suggestion that weather conditions prevented the Jelling from going out at or about the same hour on Sunday, October 28th. Counting from 2 o'clock a. m. on Thursday, October 25th, it would seem that the Jelling should have returned to the point from which she first sighted the schooner, 50 miles from Beaufort, by 2 o'clock on Sunday, thus being delayed 3 days and 12 hours from the time she began the service. This, of course, is but approximate. She claims that the time consumed was 4 days 20 hours and 15 minutes, making 1 day and 8 hours longer than would seem to have been necessary. I do not think that, in the absence of any effort to agree upon compensation with the captain of the schooner, who was at Beaufort, and who says that before the service was rendered he proposed to pay $5,000 or $6,000 to be taken into port, that the time consumed in taking the deposition should be charged to the schooner, at the rate of $1,333 a day.

[2, 3] While the actual expense incurred, or loss of time by the Jelling, do not constitute claims for which payment may be demanded, they are items to be considered. The rule by which courts of admiralty are guided in respect to them is stated by Kennedy:

"Whilst the amounts of damage, expense, or loss of profits ought not, under ordinary circumstances, to be taken as 'fixed figures,' or 'moneys numbered,' to be added to the amount of the reward for actual salvage services, the fact that such damage, expense, or loss has been caused by the performance of the salvage service is a fact which the court ought never to disregard in assessing the amount of the reward. But all the circumstances, of which this is only one, must be considered, together, and it does not follow necessarily that, because the salvor proves such damages, expenses, or losses, the court should fix the sum awarded high enough to cover them. On the contrary, the salvage service may itself be so trivial as to make it unjust, or the property salved may be of so small a value as to make it impossible to cast the burden of such an indemnity upon the owner of the salved property. * * * When, however, meritorious salvage services have occasioned to the salvors serious pecuniary loss, and when the value of the property saved is ample, not only to defray the loss sustained by a salvor, in addition to an adequate sum for salvage proper, but also to leave a substantial surplus

for the owner of the property saved, the salvor should be remunerated with a sufficient sum, both to reward him for his risk, labor, skill, and conduct, and also to cover any damages, expenses, and losses incurred through rendering the service." Kennedy on Civil Salvage, 133.

If, in this case, the value of the schooner had been "between $50,000 and $75,000," as alleged, and as the captain of the Jelling supposed, when he "made the venture" of salving and securing a large award, if successful, instead of accepting the offer for towage service, for a fixed sum, he would have been entitled to a reward very much larger than the value of his prize, as now ascertained, justifies. It would be manifestly unjust to take practically the entire value of the schooner and cargo as a reward for services which could have been rendered by a ship of very much less value and "towing power" than the Jelling, because of the large amount which she was receiving under the terms of the charter party. While the salving vessel is to be rewarded liberally for salvage service, because of the risk which she takes of receiving nothing, if unsuccessful, she also takes the risk of error in the valuation which she places on the vessel saved.

There was, in the conduct of the captain and officers of the Jelling, every element of calculation and careful consideration of the conditions, with ample opportunity for estimating the chances of success and pecuniary reward. The only error made in their calculation was in respect to the value of the William Cobb. After the schooner was anchored, with a day's time and ample opportunity for examination, the captain in his libel swore that the value of the schooner was "between $50,000 and $75,000," and her freight money $7,500. It must be assumed that he honestly thought this was true and undertook the service on that basis. While the testimony is contradictory in regard to the time at which the captain of the schooner asked the captain of the Jelling to tow the schooner into port for an agreed price, it is clear that such a conversation was had, and that his proposal to enter into such a contract was declined.

I am not inadvertent to the fact that, by reason of the local conditions following the anchorage of the schooner, the coal sold for an amount in excess of its value on board. The delay in surrendering the William Cobb to her owners, from October 28, 1917, to January 16, 1918, was due to unusual weather conditions preventing an earlier delivery of the coal.

After a careful consideration of all of the factors entering into the situation, with which all parties were confronted, I am of the opinion that an award of $4,000 should be made to the Jelling and those of her crew who assisted in the service. Each party will pay its own witnesses, including costs of subpoenas, service, and taking depositions. The other court costs will be divided equally between libelants and respondents, each paying one-half. This will include the cost of appraisal rendered necessary by the excessively exaggerated valuation put upon the schooner in the libel.

The apportionment of the amount of the award to be paid by the schooner and cargo will be provided for in the final decree. The clerk will make and report to the court a statement of the cost and expenses incurred, when a final decree will be drawn.